UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KENNETH E. CORDER, SR., et al.                                              PLAINTIFFS

v.                                                        CIVIL ACTION NO. 3:05-CV-00016

FORD MOTOR COMPANY                                                          DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on the plaintiff's motion for class certification (DN 194). The defendant has responded (DN 197) and plaintiff has replied (DN 204). For the reasons set forth herein, plaintiff's motion for class certification will be **DENIED** insofar as he seeks certification of a nationwide class.

### BACKGROUND

Plaintiff Kenneth Corder ("Corder") filed this action against defendant Ford Motor Company ("Ford") on behalf of himself and others in 2004. The thrust of Corder's complaint is that Ford did not inform Corder that his 2004 model year truck did not contain a so-called "2004"[1] engine, but rather a "2003.25" engine that lacked a number of improvements present in the 2004 model.

---

[1] In the record, Ford repeatedly objects to the use of model years to describe engines. *See, e.g.*, Pl.'s Mot. for Class Certification (DN 194), Ex. 3 at 4. Ford has admitted, however, that some of its employees referred to engines according to their "model years." *Id.*, Ex. 3 at 84, 87. For ease of reference, we will refer to the engines that are the subject of this litigation with such terms. Following the Sixth Circuit's lead in *Corder v. Ford Motor Co.*, 285 Fed. App'x 226 (6th Cir. 2008) (unpublished), an earlier appeal in this case, we will refer to engines installed in 2004 model year vehicles before October 1, 2003 as "2003.25" engines and engines installed after that date in 2004 model year vehicles as "2004" engines.

Corder purchased a new 2004 Ford F-250 Super Duty pickup containing a 6.0L Power Stroke diesel engine in May 2004. Corder has asserted that he specifically bought a 2004 model year pickup because the engines installed in the 2003 model year trucks had sparked a number of consumer complaints. At the time of the purchase, Corder was an employee at International, the company that manufactured the engines the trucks contained. He first learned that his truck might have a "2003.25" engine from a supervisor at the International engine plant; after inspecting his truck, Corder concluded that this was the case.

Ford began producing 2004 model year F-Series Super Duty trucks on July 14, 2003. Def.'s Opp'n to Pl.'s Mot. for Class Certification (DN 197), Ex. 1, ¶ 4 (Aff. of Paul Taylor). Between July 14 and July 25, 2003, Ford produced 2004 model year trucks that contained engines identical to those in the 2003 model year trucks. *Id.* at ¶ 5. After July 25, Ford began a series of ongoing changes that culminated in the installation of "2004" engines that featured a number of improvements and complied with 2004 emissions standards. Production began on trucks containing these engines on or about October 1, 2003. Ford manufactured and assembled its 2004 model year F-150 Super Duty trucks at plants in Louisville, Kentucky and Cuautitlan, Mexico. The engines at issue in this case were produced in either Indianapolis, Indiana or Alabama.

Corder's truck was assembled in September 2003. Ford has admitted that the engine contained in Corder's truck did not contain at least 30 improvements that were later included in the "2004" engines. Ford has also admitted that it did not disclose to consumers the ongoing modifications being made to the engines.

After discovering that he did not receive a "2004" engine, Corder filed suit against Ford pursuant to the Kentucky Consumer Protection Act ("KCPA"), KY. REV. STAT. § 367.170 et seq.,

alleging that Ford defrauded him and other consumers by failing to disclose to them at the time of purchase that their 2004 model year trucks did not contain "2004" engines.

The KCPA prohibits "[u]nfair, false, misleading, or deceptive acts in the conduct of any trade or commerce." KY. REV. STAT. ANN. § 367.170(1). The statute allows private purchasers or lessees of goods "primarily for personal, family or household purposes" who suffer "any ascertainable loss of money or property" to bring a private suit to recover for the loss. KY. REV. STAT. ANN. § 367.220(1).

Following initial discovery, Ford moved for summary judgment, which this court granted on the grounds that Corder failed to show Ford's actions were false, misleading, or deceptive or that he had suffered the "ascertainable loss" required to maintain a private action under the KCPA. On appeal, the Sixth Circuit reversed, holding that a reasonable jury could find Ford's actions were deceptive under the KCPA and that a jury could find that Corder suffered some ascertainable loss because he received an engine that was not the same as the one a reasonable consumer would have expected. *See Corder v. Ford Motor Co.*, 285 Fed. App'x 226 (6th Cir. 2008) (unpublished).

Corder now seeks to certify this class as a multi-state class action on behalf of a class he defines as:

> All persons who were original purchasers of 2004 model year Ford F-Series Super Duty Trucks and Excursions which Ford Motor Company manufactured and installed with 6.0L "Power Stroke" diesel engines before October 1, 2003. To be excluded from the Class are the judges to whom this case is assigned and their staff.[2]

---

[2]The class definition as initially proposed read as follows:

All persons who were original purchasers of 2004 model year Ford F-Series Super Duty Trucks and Excursions which Ford Motor Company manufactured and installed with 6.0L "Power Stroke" diesel engines before October 1, 2003. To be excluded from the Class are persons employed by or otherwise related to

continue...

**ANALYSIS**

Certification of a class action is governed by Rule 23 of the Federal Rules of Civil Procedure. The party seeking certification bears the burden of showing that a class action is appropriate, *In re Amer. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996), and the district court must conduct a "rigorous analysis" into whether Rule 23's requirements are met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). A district court has "broad discretion in determining whether a particular case may proceed as a class action" so long as the court applies Rule 23's criteria correctly *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977).

**1. Class-Wide Application of Kentucky Law**

Before we examine the Rule 23 factors, we must address Corder's argument that the claims of all putative class members may be prosecuted under the Kentucky Consumer Protection Act. Corder seeks to certify a class consisting of all original purchasers of 2004 Ford F-Series Super Duty Trucks that contained the "2003.25" engines. Corder does not specify where these purchasers are located, but requests in his Motion for Class Certification that this court certify a "nationwide" class. Pl.'s Mot. for Class Certification (DN 194) at 1. Presumably, this means that the class would at least include purchasers from all 50 states and the District of Columbia.

Corder claims Kentucky law applies to all of these purchasers' claims. When a plaintiff argues for the uniform application of one state's law to a multi-state class, we must ensure that such

---

[2]...continue
Defendant, or its subsidiaries, their successors, or affiliates, and any and all members of the federal judiciary.

Upon inquiry from the court (DN 205), Corder revised this class to remove the exclusion for employees of Ford and its subsidiaries, successors, or affiliates, as well as its exclusion of all members of the federal judiciary (DN 208).

choice of law does not violate the principles set forth in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). In *Shutts*, the United States Supreme Court held that where a plaintiff seeks to apply a single state's law in a multi-state class action, that state must have a "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary or unfair." *Shutts*, 472 U.S. at 818 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)).

*a. Kentucky's Contact with Putative Class Members' Claims*

Here, Kentucky would have a "significant contact" with and a "state interest" in some – but not all – claims by members of the putative class. Such a contact would certainly exist with respect to individuals who purchased their trucks in Kentucky, given that Kentucky, like all other states, has a strong interest in regulating trade practices within its own borders. *See* KY. REV. STAT. ANN. § 367.110(2) (defining "trade" or "commerce" under the KCPA as including "any trade or commerce directly or indirectly affecting the people of this Commonwealth.").

Kentucky would not, however, have a "significant contact" with or a "state interest" in the claims of individuals who did not purchase their trucks in the state. The only contact Kentucky has with these plaintiffs' claims is that some of the engines in question were installed in some of the 2004 trucks at Ford's Kentucky Truck Plant in Louisville. Corder argues that this contact is sufficient to warrant the application of Kentucky law, claiming that the placement of the engines in the truck marked the point at which the "material omission" forming the basis of his claim "originated." Pl.'s Reply at 2.

Corder's argument on this point fails for several reasons. First, the mere placement of a component manufactured elsewhere inside a motor vehicle does not give rise to a "significant

contact" with Kentucky. In *Rutherford v. Goodyear Tire & Rubber Co.*, 943 F. Supp. 789 (W.D. Ky. 1996), Judge Heyburn of this court examined whether Kentucky products liability law could be applied to the claims of an Indiana resident who was injured in Indiana by another Indiana resident in an automobile accident that was allegedly due to a defective spare tire. *Id.* at 790–91. The defendants were Goodyear, an Ohio corporation with its principal place of business in Ohio, and Ford, at the time a Michigan corporation with its principal place of business in Michigan. *Id.* at 791. The tire was manufactured in Topeka, Kansas. *Id.* The sole connection between the claim and Kentucky was that the tire was mounted in the spare tire compartment of a Ford LTD at Ford's Louisville, Kentucky plant. *Id.* The court held that any interest Kentucky had in a the claim simply because the tire and truck were "assembled" there was "minimal." *Id.* at 792–93. Similarly, any interest Kentucky would have as the result of the placement of the "2003.25" engines – which were themselves manufactured in Indiana and Alabama – in 2004 F-Series Super Duty trucks is also minimal.

Second, we are not convinced that any "material omission" occurred simply because Ford placed the engines at issue into the 2004 trucks. Corder does not allege that the engines themselves were defective or improperly installed in the trucks. Rather, his consumer protection claim hinges on the allegation that Ford failed to disclose material facts about the engines to purchasers, who, as a result, did not receive the products they bargained for. Logically, then, any injury would have occurred when the consumer bought the truck without the benefit of a full disclosure of the engine's attributes. A 2004 truck containing a "2003.25" engine harmed no one simply because it was manufactured. The harm in this case – if any – would have occurred at the time and place of purchase.

Finally, Corder's argument is further undermined by the fact that some of the trucks at issue in this case may not have not even been assembled in Kentucky at all. An unspecified number of 2004 F-Series Super Duty trucks were assembled at Ford's plant in Cuautitlan, Mexico. Pl.'s Mot. for Class Certification, Ex. 10, at 19–20. The record does not indicate whether any of the trucks with the "2003.25" engines were assembled there, but we note that Kentucky would have absolutely no interest in the claims of individuals who purchased one of the Mexican-made trucks outside the state of Kentucky.

In sum, we find that Kentucky does not have a "significant contact . . . creating state interests" in the claims of all class members such that its law may be applied class-wide.

*b. Conflict of Laws Analysis*

Our finding that Kentucky lacks sufficient contacts with the claims of all plaintiffs does not end our inquiry with respect to the class-wide application of Kentucky law. We must also examine whether Kentucky law conflicts in a material way with that of other jurisdictions because "[t]here can be no injury in applying [Kentucky] law [to all plaintiffs' claims] if it is not in conflict with that of any other jurisdiction connected to this suit." *Shutts* 472 U.S. at 816.

Corder claims that KCPA does not differ in any material respect from other states' consumer protection acts. Corder notes that the KCPA, like other state statutes, is "analogous to the Federal Trade Commission Act." Corder also cites a decision from the Ninth Circuit Court of Appeals that described the differences in state consumer protection laws as "idiosyncratic" and therefore not preclusive to the certification of a nationwide class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1988).

Many other courts, however, have noted substantial differences in state consumer protection statutes. *See, e.g.*, *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1119–21 (8th Cir. 2005) (holding that the district court erred in certifying class without considering the difference in state consumer protection statutes); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("[s]tate consumer protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 219 (E.D. Pa. 2000) ("[s]tate consumer protection acts vary on a range of fundamental issues."); *In re General Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1536–37 (E.D. Mo. 1997) ("[e]ach state's [consumer protection] statute is unique.").[3] *See also* John S. Kiernan et al., *Developments in Consumer Fraud Class Action Law*, 537 PLI/PAT 237, 277–83 (1998) (outlining the ways in which state consumer protection statutes differ).

One such difference is that some states require a consumer to rely on the defendant's allegedly deceptive misrepresentation or omission in order to prevail in a consumer protection action. *See, e.g.*, *Hageman v. Twin City Chrysler-Plymouth, Inc.*, 681 F. Supp. 303, 308 (M.D.N.C. 1988) (citing *Pearce v. Amer. Defender Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986)). Others – such as Kentucky – do not. *See Telcom Directories, Inc. v. Corn ex rel. Cowan*, 833 S.W.2d 848, 850 (Ky. App. 1991) (finding that actual deception of a consumer is not required to raise a violation of the KCPA). This difference in particular could have significant implications for Ford's liability

---

[3] A federal district court for the Southern District of California has also recently cast doubt on the uniform application of *Hanlon's* "idiosyncratic" view of state consumer protection statutes. In *Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484 (S.D. Cal. 2009), the district court noted that *Hanlon's* characterization came in the context of the certification of a settlement class pursuant to a settlement agreement. The district court explained that while *Hanlon* might be "instructive" in some instances, it does not automatically justify the certification of a nationwide class in all cases – including those in which there are "strong objections" to class certification. *Id.* at 487.

in this case. Some putative class members' purchases of 2004 model year trucks may have been in reliance on the idea that the trucks contained "2004" engines, while other plaintiffs' purchases could have been based on other factors entirely. Thus, Ford could potentially be liable for its alleged omissions only with respect to those plaintiffs who relied on them in some states, but would be liable for *all* plaintiffs' purchases in others.

Moreover, state laws also vary with respect to whether the plaintiff must prove scienter on the part of the defendant to recover – another element of proof that could have significant implications for Ford's liability. *Compare*, *e.g.*, *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 (Ky. App. 2000) (no intent to deceive necessary under KCPA) *with* N.J. STAT. ANN. § 56:8-2 (outlawing the "knowing, concealment, suppression, or omission of any material fact *with intent that others rely upon such concealment, suppression or omission* in connection with the sale or advertisement of any merchandise . . . .") (emphasis added).

Finally, states vary with respect to who may seek recovery under their act. Kentucky, for instance, limits actions under the KCPA to "person[s]"[4] who "[purchase] or [lease] goods or services primarily for personal, family or household purposes." KY. REV. STAT. ANN. § 367.220(1). Other states, however, include those who purchase goods for business purposes in their consumer protection statutes. *See* KAN. STAT. ANN. § 50-624(b) ("'Consumer' means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes."). Thus, the scope of Ford's liability could be much greater in jurisdictions that allow business purchasers to recover than in those that, like Kentucky, limit consumer protection actions to personal, family, or household purchases. These

---

[4]"Persons" include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." KY. REV. STAT. ANN. § 367.110(1).

examples are not meant to be an exhaustive survey of the ways in which the KCPA differs from the consumer protection statutes of other states. However, they illustrate the fact that Kentucky law conflicts with the laws of several other jurisdictions in at least three respects relevant to this case.

Even though Kentucky law conflicts in material ways with the laws of other jurisdictions, Kentucky law may still be applied to all class members if application of the relevant choice of law principles allows it. *See Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008). A federal district court sitting in a diversity case must apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Anderson Dev. Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1131 (6th Cir. 1995). Thus, we will look to Kentucky choice of law rules here.

In contract actions, Kentucky courts apply the "most significant relationship" analysis found in the Restatement (Second) of Conflicts of Law. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). However, in tort actions, Kentucky courts law will apply Kentucky law so long as a party has "any significant contacts" with the forum. *Id.* Some state courts have explicitly addressed the choice of law provisions applicable to consumer protection actions, *see Siegel*, 256 F.R.D. at 585, but Kentucky has not done so. Kentucky courts have also not specified whether a KCPA action sounds in contract or in tort, although other courts have recognized that a cause of action for deceptive trade practices contains elements of both tort and contract law. *See Fin. Software Sys., Inc. v. First Union Nat'l Bank*, No. Civ.A. 99-CV-623, 1999 WL 1241088 (E.D. Pa. Dec. 16, 1999) at *7. This distinction is immaterial here, because both tort and contract choice of law principles weigh against the class-wide application of Kentucky law.

Under the choice of law principles applicable to tort actions, Kentucky would have no "significant contact" with the claims of individuals who did not purchase their trucks in Kentucky. As we noted above, Kentucky's only contact with those plaintiffs would be that the engines at issue in this case were placed inside trucks at Ford's Louisville plant – a contact that, standing alone, fails to support the application of Kentucky law to the claims of non-Kentucky plaintiffs. *See Rutherford*, 943 F. Supp. at 793. Rather, under the tort choice of law analysis, it seems to us that the states where the alleged harm occurred would be the states with the requisite "significant contacts" to justify application of their laws. *See Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. App. 1968) (holding that the occurrence of an accident in Kentucky was a sufficient contact to justify the application of Kentucky law even though plaintiff and defendant were both Ohio residents).

Application of the choice of law rules for contract actions also shows that the class-wide application of Kentucky law would not be appropriate in this case. Kentucky courts evaluating choice of law issues in contractual disputes apply the principles articulated in § 188 of the Restatement (Second) of Conflict of Laws. *Saleba*, 300 S.W.3d at 181. Section 188 provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."[5] Section 188 offers five considerations

---

[5]Section 6 of the Restatement provides:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable law include
      (a) the needs of the interstate and international systems,
      (b) the relevant policies of the forum
      (c) the relevant policies of other interested states and the relative interests

continue...

to guide the court's analysis in the absence of a contractual choice of law provision: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* § 188(2).

An evaluation of these factors leads to the conclusion that Kentucky would not be the state with the most significant relationship to many class members' claims. Here, the "place of contracting" and "place of negotiation" of the contract would the state in which each purchaser bought his or her truck. The "place of performance" would be the state in which the purchaser took possession of the vehicle. The "location of the subject matter" would be the state in which the purchaser's truck is located. *See Lyon*, 194 F.R.D. at 213 n.9. Given that the trucks were purchased and are owned by individuals throughout the United States, these four factors do not support a finding that the class-wide application of any one state's law is warranted. *Id.* Rather, it seems that this analysis would tilt strongly in favor of applying the law of the state in which the each purchaser bought his or her truck.

The fifth Restatement factor – which looks to the domicile, residence, nationality, place of incorporation and place of business of the parties – is the only one that would potentially indicate the uniform application of any one state's law. Ford is a Delaware corporation with its principal place of business in Michigan, giving Delaware and Michigan at least some interest in this action.

---

[5]...continue
        of those states in the determination of the particular issue,
        (d) the protection of justified expectations,
        (e) the basic policies underlying the particular field of law,
        (f) certainty, predictability and uniformity of result, and
        (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

However, Corder has not alleged that either of these states' laws should apply to all plaintiffs' claims, and even if he had, we are not convinced that either of these states would have a more significant relationship to the claims in this case than the states in which the purchasers bought their trucks.

Corder cites an Oklahoma case – *Ysbrand v. DaimlerChrysler*, 81 P.3d 618 (Okla. 2003) – for the proposition that the "most significant relationship" analysis supports the classwide application of Kentucky law. In *Ysbrand*, the Oklahoma Supreme Court, applying the "most significant relationship" test, held that Michigan law should apply to all plaintiffs' claims in a nationwide breach of warranty class action against DaimlerChrysler. *Id.* at 629. In its opinion, the court discounted the first four factors from the § 188 test, basing its conclusion that Michigan law should apply on the fact that DaimlerChrysler had a principal place of business in Michigan. *Id.* at 627. The court found that Michigan's interest in applying its regulatory scheme to a Michigan manufacturer surpassed the interests of other states; it also found relevant the fact that Michigan was "the only state where conduct relevant to all class members occurred." *Id.* at 626–27.

*Ysbrand* fails to bolster Corder's case. First, *Ysbrand* addressed only the class-wide application of the state law of a defendant's principal place of business. It did not address the application of the law of the state in which goods were simply assembled, which is what Corder urges here. Furthermore, we are not convinced that *Ysbrand's* analysis is applicable in the consumer protection context. The cause of action in *Ysbrand* was grounded in a breach of warranty claim under the Uniform Commercial Code; the court observed that "the relative interest of each buyer's home state in applying its version of the UCC is more or less equal." *Id.* at 626. However, each state's interest in applying its own law is heightened when consumer protection statutes are in play,

and one state's interest in protecting its citizens from fraudulent trade practices does not trump any other state's interest in the same issue. *See Lyon*, 194 F.R.D. at 211–12 ("All of the relevant jurisdictions have an interest in utilizing the state statute crafted by their state's legislature to protect their consumers and/or residents.").

In sum, neither tort nor contract choice of law analysis supports the imposition of Kentucky law on Corder's claims. The KCPA may not be applied to a nationwide class of purchasers in this action. Rather, we find that choice of law principles would mandate the application of the laws of the states in which the putative class members purchased their vehicles.

**2. Rule 23 Analysis**

A class action may only be certified if it meets all of the requirements of Federal Rule of Civil Procedure 23(a): the class must be so numerous that joinder of all members is impracticable; there must be questions of law or fact common to the class; the claims or defenses of the representative parties must be typical of the class; and the representative parties must fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).

In addition to meeting these prerequisites, a class action must fall within one of the categories set forth in Federal Rule of Civil Procedure 23(b). Here, Corder seeks certification pursuant to Rule 23(b)(3), which requires the court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. FED. R. CIV. P. 23(b)(3). Because failure to satisfy either Rule 23(a) or 23(b) is fatal to certification of a class action, we need address only the 23(b)(3) requirements here.

In order to meet the Rule's demand that common issues predominate, a plaintiff must show that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quotation omitted). When considering whether a class action is a superior means of adjudicating the controversy, the factors a court may consider include the class members' interest in individually controlling their separate actions; the extent and nature of existing litigation by class members concerning the same claims; the desirability of concentrating the litigation in the particular forum; and the likely difficulties in the management of a class action. FED. R. CIV. P. 23(b)(3).

Corder's arguments with respect to predominance and superiority are all based on the assumption that the KCPA may properly apply to all members of the putative class. This is not the case. Kentucky lacks the necessary interests in all claims in this action to justify applying its laws class-wide. Corder has not argued for the uniform applicability of any other state's law, and it seems to us that, pursuant to Kentucky choice of law rules, the consumer protection laws of all states in which purchases took place would have to be applied to this action. This would lead to significant problems of individualized proof and manageability.

Some issues – such as factual questions pertaining to whether Ford installed "2003.25" engines in 2004 model year trucks, and whether Ford informed consumers of this fact – could be resolved on a class-wide basis. However, these common issues would quickly be swamped by individualized questions of law and fact that would vary depending on the contours of each state's consumer protection statute. Certification of a nationwide class would saddle this court from the outset with the need to apply the varying consumer protection laws of many states – a manageability

challenge in and of itself – and with eventually instructing a jury on the many relevant state laws. *See Amer. Med. Sys.*, 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action.")

Moreover, although it might be possible to resolve the claims of the consumers in some jurisdictions (such as those that do not require reliance) on a statewide basis, the laws of other jurisdictions would demand more searching inquiries. For instance, applying the law of a jurisdiction that conditions a consumer's recovery on reliance on the alleged misrepresentation or omission would require this court to manage an individualized inquiry into the state of mind of each consumer in that jurisdiction. Even if only a few jurisdictions require reliance, these individual determinations could easily overwhelm the action.[6] Other courts faced with similar putative class actions have recognized similar problems in prosecuting consumer protection claims on a nationwide basis and have therefore found denial of certification the appropriate response. *See, e.g.*, *Bridgestone/Firestone*, 288 F.3d at 1018; *Siegel*, 256 F.R.D. at 585–86; *In re Prempro Prods. Litig.*, 230 F.R.D. 555, 556–57 (E.D. Ark. 2005); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002); *Lyon*, 194 F.R.D. 206, 218–22 (E.D. Pa. 2000).

Given the manageability concerns inherent in this litigation, we are convinced that a class action is not a superior method of adjudicating this controversy. Because a class action here would require the application of the laws of numerous jurisdictions, there is little advantage to be had in

---

[6]Corder claims that there are approximately 49,000 putative plaintiffs in his class, which would work out to an average of about 980 potential plaintiffs per state. Even assuming that the states that require reliance on the part of the consumer have well below the average number of plaintiffs, this court would still be faced with the possibility of conducting hundreds of individualized inquiries into the reliance issue.

concentrating the litigation in this particular forum. As we have explained, any efficiency encouraged by the class-wide resolution of a few common questions of fact would be well outweighed by the problems inherent in managing dozens of subclasses of purchasers, applying a wide and varying array of state laws, and conducting the individualized inquiries that would be necessary pursuant to some states' consumer protection statutes.

Corder provides nothing in the way of showing how this court might manage this action on a nationwide basis or why a multi-state class action applying the laws of 50 states is a better method of adjudication than actions brought by individual consumers. His response to the choice of law issues raised in the defendant's response to his motion for certification was a continued insistence on the class-wide applicability of Kentucky law, which, as we have explained, is unwarranted here. This action fails to meet the predominance and superiority requirements of Rule 23(b)(3), and Corder's motion for class certification insofar as he seeks certification of a nationwide class will therefore be denied.

A separate order will issue in accordance with this opinion.