UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KENNETH E. CORDER, SR., on Behalf
of Himself and All Others Similarly Situated           PLAINTIFFS

v.                CIVIL ACTION NO. 3:05-CV-00016

FORD MOTOR COMPANY                DEFENDANT

**MEMORANDUM OPINION**

   This matter is before the court on the plaintiff's second motion for class certification (DN 218). The defendant has responded (DN 228) and the plaintiff has replied (DN 232); thus, the matter is ripe for adjudication. For the reasons set forth herein, the plaintiff's second motion for class certification will be denied.

**I.**

   To make a meaningful determination of the certification issues, a court must understand the claims, defenses, relevant facts, and applicable substantive law. *See Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011); *Reeb v. Ohio Dept. of Rehab. & Corr.*, 435 F.3d 639, 644-645 (6th Cir. 2006). With that in mind, we present the following summary of the factual allegations made by plaintiff Kenneth E. Corder, Sr., as well as defendant Ford Motor Company's view of the relevant facts in this case. A summary of the procedural history of the case follows.

*A. Corder's Allegations and Ford's Responses*

Corder brought this action against Ford for allegedly violating the Kentucky Consumer Protection Act ("KCPA"). Corder alleges that the 6.0L Power Stroke diesel engines installed by Ford in model year 2003 F-Series Super Duty Trucks and Excursions were highly problematic. Corder claims that those engines, which he deems the "2003 engines," were "renowned for a host of serious problems," leading Ford to implement a customer service program for those vehicles and even to recall and buy back some vehicles installed with those engines (Second Amended Complaint, DN 215 ¶ 14). Corder alleges that many consumers waited until the 2004 model year to purchase F-Series Super Duty Trucks or Excursions, believing that Ford would make improvements to the "2003 engines" (*Id.*). However, Corder claims, Ford continued to install "2003 engines" in model year 2004 Super Duty Trucks and Excursions that were assembled in July, August, and September of 2003 (*Id.* ¶ 15). Then, in October 2003, Ford "orchestrated a coordinated change" with its engine manufacturer "to implement changes and improvements" in the 6.0L Power Stroke diesel engine for the remainder of the 2004 model year (*Id.* ¶ 16).

In May of 2004, Corder purchased a model year 2004 Ford F-250 Super Duty Truck with a 6.0L Power Stroke diesel engine (Second Amended Complaint, DN 215 ¶ 19). Shortly thereafter, Corder claims, he found out that the engine in his truck was a "2003 engine" that did not have the improvements that were in the "2004 engine" (*Id.*). According to Corder, Ford's non-disclosure that it had installed a "2003 engine" in his model year 2004 truck was an unfair, false, misleading, or deceptive act within the meaning of the KCPA, and it caused him to suffer an ascertainable loss (*Id.* ¶¶ 21, 32).

Ford, for its part, takes issue with Corder's claim that its engines have model years. Ford claims, in effect, that it makes running changes to its engines throughout the year (*see* DN 228 at 5-10). Thus, Ford argues that the purchasers of 2004 model year trucks built prior to October of 2003 received multiple different engines, and "all of those engines were improved over most engines installed on most 2003 vehicles" (*Id.* at 1-2, 6). Ford further claims that "in the months and days before and after October 1, 2003," it was making "constant quality improvements" to the engines (*Id.* at 2, 5-7, 9-10). Ford takes the position that October 1, 2003 was simply a date on which it made additional changes to the engines that brought them up to 2004 emissions standards (*Id.* at 2, 8).

### *B. Procedural History*

Following initial discovery, Ford moved for summary judgment. This court granted the motion, finding that Corder had not shown that Ford's actions were false, misleading, or deceptive within the meaning of the KCPA, nor had Corder shown that he suffered an "ascertainable loss," as is required to maintain a private action under the KCPA. The Sixth Circuit disagreed with this court's disposition, holding that a reasonable jury could find that Ford's actions were deceptive and that Corder suffered an ascertainable loss when he received an engine that was not the same as the one a reasonable consumer would have expected. *See Corder v. Ford Motor Co.*, 285 F. App'x 226 (6th Cir. 2008).

Upon remand to this court, Corder filed a motion to certify a national class, which he defined as:

> All persons who were original purchasers of 2004 model year Ford F-Series
> Super Duty Trucks and Excursions which Ford Motor Company manufactured
> and installed with 6.0L "Power Stroke" diesel engines before October 1, 2003. To

> be excluded from the Class are the judges to whom this case is assigned and their staff.

However, this court denied Corder's motion, finding that a national class was not viable because the laws of each of the states in which the putative class members purchased their vehicles would have to be applied, which would lead to significant problems of individualized proof and manageability. This court identified state laws that required proof of reliance as posing particular problems, since the element of reliance would require an individualized inquiry into the state of mind of each consumer.

This court then granted Corder leave to file a second amended complaint, in which he sought to represent a class of only Kentucky residents, which he defined as follows:

> All Kentucky residents who were original purchasers of 2004 model year Ford F-Series Super Duty Trucks or Excursions which Ford Motor Company manufactured and installed with 6.0L "Power Stroke" diesel engines before October 1, 2003. To be excluded from the Class are the judges to whom this case is assigned and their staff.

The second amended complaint stated that there were at least 586 members of the class, whose identities and addresses can be readily ascertained from Ford's records.

Ford moved to dismiss Corder's second amended complaint. Ford contended that the KCPA required proof of reliance, but Corder did not plead in the second amended complaint that he had relied on Ford's deceptive act. This court denied Ford's motion to dismiss, finding that the KCPA did not require proof of reliance.

Meanwhile, after filing his second amended complaint, Corder filed a second motion for class certification, seeking to certify the class of Kentucky residents in his second amended complaint. Having denied Ford's motion to dismiss, this court now turns to Corder's second motion for class certification.

## II.

The party seeking certification of a class action bears the burden of showing that a class action is appropriate. *In re Amer. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). A district court considering a motion for class certification must conduct a "rigorous analysis" into whether the requirements of Rule 23 of the Federal Rules of Civil Procedure are met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). In doing so, it may be necessary for the court to "probe behind the pleadings." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). A district court has "broad discretion in determining whether a particular case may proceed as a class action" so long as the court applies Rule 23's criteria correctly. *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977).

In order for a class action to be certified, it must meet the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact that are common to the class; (3) the claims or defenses of the representative parties must be typical of the class; and (4) the representative parties must fairly and adequately protect the interests of the class.

In addition to meeting those prerequisites, a class action must fall within one of the categories set forth in Federal Rule of Civil Procedure 23(b). Corder seeks certification under Rule 23(b)(3), which requires the court to find that the questions of law or fact that are common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Here, we find that Corder has not met his burden of showing that the requirements

of Rule 23(b)(3) are met. Because that failure dooms certification of a class action, this court need not address the requirements of Rule 23(a).

In order to meet the demand of Rule 23(b)(3) that common issues predominate, a plaintiff must show that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)). The predominance requirement in Rule 23(b)(3) "guards against certifying class actions that could overwhelm or confuse a jury or compromise a party's defense." 59 Am. Jur. 2d, Parties, § 74, p. 522 (2012)."[C]ertification is not appropriate unless it is determinable from the outset that the individual issues can be considered in a manageable, time-efficient, and fair manner." *Id.* The predominance requirement "is one of the most stringent prerequisites to class certification." *Id.*

> KRS § 367.220, the provision for recovery of damages under the KCPA, provides:
>
> Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170 may bring an action . . . to recover actual damages.

KRS 367.170 declares "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Thus, for Ford to be liable for damages to a person under the KCPA, it must be established that: (1) the person purchased or leased a Ford vehicle in question primarily for personal, family, or household purposes; (2) the person suffered an ascertainable loss; and (3) the loss was a result of an unfair, false, misleading or deceptive act or practice.

Here, some of the issues in this case may be resolvable on a class-wide basis. For instance, the factual issue of whether Ford installed "2003 engines" in 2004 model year trucks, as Corder alleges, or whether Ford's engines do not have model years and instead are updated on a running basis, as Ford maintains, can be resolved by common proof. And, assuming that issue were resolved in favor of Corder, the related issue of whether the practice of installing "2003 engines" in 2004 model year trucks without disclosure of that fact was an unfair, false, misleading or deceptive act or practice may be resolved through class-wide proof. Additionally, the Sixth Circuit made clear that the "ascertainable loss" element may be shown by evidence that a purchased truck "was not as a reasonable consumer would expect it." *Corder*, 285 F. App'x at 229. That objective standard would also lend itself to class-wide proof.

But that those issues, which are undoubtedly important to the merits of Corder's KCPA claim, may be resolved on a class-wide basis does not mean that the class-wide issues predominate. As noted above, to establish liability under the KCPA, it also must be shown that the good at issue was purchased primarily for personal, family, or household purposes.

In this case, the need to determine the primary purpose for each customer's purchase requires an individualized inquiry that threatens to overwhelm any trial on the matter. The trucks at issue–Ford F-Series Super Duty Trucks and Excursions that have been installed with 6.0L Power Stroke diesel engines–are not the type of product about which it may be inferred that all, or even the vast majority, were purchased primarily for a personal, family, or household purpose. It is not hard to think of types of products for which it could be presumed that nearly all purchases were made primarily for personal, family, or household use: for instance, cold medicine or non-commercial-grade appliances. But it is far from clear solely from the nature of

the large pickup trucks at issue here whether any particular purchaser was aiming to use the trucks primarily for personal, family, or household use or primarily for some business or commercial use.

In fact, Ford has offered the court various documents suggesting that a large number of the purchasers of the trucks at issue bought them primarily for commercial use. Ford submitted a copy of a page from a Ford Source Book, which a signed declaration from a Ford Design Analysis Engineer described as a document that is provided by Ford to Ford dealers in the ordinary course of business to assist the dealers in marketing and selling Ford vehicles (DN 228-4). That page from the Source Book specified that Ford expected commercial customers to make up approximately 40% of the Super Duty Truck market, small business customers who also use their vehicles for personal use to comprise 25% of the market, and the remaining 35% of the market to be comprised of recreational users (*id.*). And, as to the 2004 Ford Excursion, the declaration from the Ford Design Analysis Engineer stated that it was "designed for heavy-duty use, including commercial use, and was too large to fit in many home garages" (*id.*).

Corder argues that Ford's estimates of the percentages of each type of user are not authenticated, and thus should be given no weight at all. However, this argument misses the mark for several reasons. First, the Ford Source Book appears to be a document that was not created for litigation, but was created for Ford's business purposes, thus lending it an air of credibility. Moreover, the estimates simply make sense, given the type of vehicles at issue. Indeed,
while Ford's numbers may be general estimates, and far from conclusive as to the exact percentage of each type of purchaser of those vehicles, the numbers are at least adequate to

demonstrate the point that a substantial number of customers may have purchased their trucks for commercial, as opposed to household, reasons. And finally, the court notes that the burden on a class certification motion belongs to the plaintiff, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409, 416 (6th Cir. 2012), but Corder offers not a scintilla of evidence controverting the suggestion that numerous customers purchased their trucks either partially or wholly for commercial purposes.

     Not only does it appear likely that many members of Corder's proposed class purchased their trucks primarily for commercial purposes, but the litigation of that issue will require individualized inquiries into numerous class members. Clearly, the question of why any particular customer purchased the pickup truck is not something that can be resolved on a class-wide basis. Thus, the question is whether such an individualized inquiry destroys the predominance of class-wide issues. In this instance, the court finds it does.

     Corder suggests that there are approximately 600 members in his proposed class. As noted above, Ford estimates that 40% of those bought their vehicles for business use, and another 25% for mixed business and personal use. That Ford believes that the number of persons who purchased their vehicles for some sort of business use could total up to 65% of the members of the proposed class bespeaks the importance of the issue to Ford and thus the likelihood that Ford will focus a portion of its litigation efforts to contesting that element of the claim.

     Nor will the individualized inquiries into the issue necessarily be the types of pro forma inquiries that conceivably could be resolved in a simple and efficient manner, such that it may still be said that the common issues will predominate. Instead, the court has grave concerns that

many of the individualized inquiries will require jurors to resolve competing arguments based on detailed facts, thereby overwhelming the trial of the common issues.

The "primarily for personal, family, or household purposes" element of the claim that gives this court concern is a subjective one by its terms, focusing on the reasons underlying a particular person's reasons for purchasing a truck. Moreover, the statute does not restrict claims to those purchasers whose only purpose was personal, family, or household related, but requires only that such a purpose be the primary one. That a purchaser can have a commercial purpose for the purchase of a truck, so long as that is only a secondary purpose, makes the individualized inquiries and their resolution by a jury all the more detailed and complicated.

*Broughton v. Adams Pontiac Buick GMC Truck, Inc.*, 272 F. App'x 491 (6th Cir. 2008), demonstrates the point. In *Broughton*, the District Court had held that the plaintiffs could not recover under the KCPA because they purchased a pickup truck to help run a farm. *Broughton*, 272 F. App'x at 495. The Sixth Circuit reversed, finding that there was a genuine issue of material fact as to whether the truck was purchased primarily to maintain a commercial farm. *Id.* at 495-496. The Sixth Circuit noted that the plaintiffs were schoolteachers who lived on a farm, where they kept horses for recreational purposes and grew crops that they gave away for no profit. *Id.* at 495. On the other hand, the plaintiffs admitted that they would "like to start something with alpacas," although, the Sixth Circuit noted, they had not yet purchased any alpacas. *Id.* The Sixth Circuit stated that the question under the KCPA is not whether a plaintiff intended "some commercial purpose" for a truck, but the question was rather what the primary intended use for the truck was. *Id.*

The analysis in *Broughton* shows that the resolution of the factual question of the primary purpose for which a particular customer intended to use his or her truck will be far from simple in certain cases. While there will likely be many cases where the issue will not be so unclear, this court's concern lies in the likelihood that there will be many cases requiring that level of factual inquiry. As noted above, Ford estimated that 25% of the Super Duty truck customers would be small business owners who would use their trucks for both commercial and personal use. And, as also explained above, the court finds Ford's estimate to be reasonable, inasmuch as it makes sense, it comes from a document prepared for Ford's business purposes rather than for litigation, and Corder has not presented any evidence to the contrary.

Obviously, it is those types of small business customers who would present the most difficult cases: the farmers, plumbers, landscapers, etc., who use their trucks both for business and personal uses. The question of what their primary intended use for their trucks was at the time of the purchase is nothing more than an inquiry into their state of mind. And with an estimated class of approximately 600 persons, having to undertake an individualized inquiry into the state of mind of even one-quarter of them simply to establish Ford's liability will overwhelm any trial in this matter.

Indeed, courts are wary, for obvious reasons, of granting class status in cases where individual proof regarding numerous class members must be adduced to establish liability or a defense to liability. *See, e.g.*, *Butler v. Sterling*, 210 F.3d 371, 2000 WL 353502, at *6 (6th Cir. Mar. 31, 2000) (unpublished table decision) (noting that "the Advisory Committee Notes to Rule 23(b)(3) advise against class certification where a defendant has a defense to liability that will vary with each individual class member"); *Yadlosky v. Grant Thorton, L.L.P.*, 197 F.R.D. 292,

298-299, 301 (E.D.Mich. 2000) (denying motion for class certification where individualized proof of reliance was required); 7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1778 (3d ed. 2005) ("[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate); 59 AM. JUR. 2d *Parties* § 74, p. 524 ("The court must be mindful that the necessity of individualized testimony from each class member to prove an essential element of the cause of action defeats class certification."); 12 FEDERAL PROCEDURE, LAWYERS EDITION § 12:223 (2004) ("[I]f there is a likelihood that significant questions not only of damages but of liability and defenses to liability will arise affecting individual members of the class in different ways, class action treatment is inappropriate.").

In *Garrish v. United Auto., Aerospace, & Agric. Implement Workers of Am.*, 149 F. Supp. 3d 326 (E.D.Mich. 2001), the court denied class certification because the defendants averred that they would submit a statute-of-limitations defense as to each plaintiff, which would require each plaintiff to put forth evidence showing that he did not know, or have reason to know, of the predicate acts for the cause of action. *Garrish*, 149 F. Supp. 2d at 333. The court stated that it "seriously questions whether 'the defendants could realistically be expected to argue the applicability of the statute of limitations defenses to numerous class members individually at one trial' and whether the jury could 'assimilate such overwhelming information.'" *Id.* (quoting *Butler*, 210 F.3d 371, 2000 WL 353502, at *7).

Like in *Garrish*, this court questions whether it is possible to have the parties adduce evidence concerning the primary purpose behind hundreds of truck purchases, much less for the jury to then sort through that information and reach a verdict concerning each class member. It

comes as no surprise that other courts have declined to certify class actions based, at least in part, on concern over the proof of an element similar to the one at issue here. *See In re OnStar Contract Litig.*, 278 F.R.D. 352, 379-381 (E.D.Mich. 2011); *Arabian v. Sony Elecs., Inc.*, 2007 WL 627977, at *14 (S.D.Cal. 2007); *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 593 (W.D.Mich. 2001); *Carpenter v. BMW of N. Am., Inc.*, 1999 WL 415390, at *3 n.6 (E.D.Pa. 1999).

Corder argues that finding that the individual inquiry into the primary purpose for which each customer purchased their truck predominates will, effectively, render it impossible to bring a consumer protection class action (*see* DN 232 at 11). But that argument fails. First, it is the nature of the product at issue here–large pickup trucks that are often purchased for business uses–that prevents certification of a class under the KCPA. As mentioned above, one could think of many products about which it would not be in question that the products were purchased almost exclusively for personal, family, or household purposes.

And, more fundamentally, Corder's issue is with the statute itself. The requirement that a person have purchased a product primarily for personal, family, or household use prior to a finding of liability under KRS § 367.220 is an explicit element of the statute. Ford, of course, has every right to demand a full litigation of that element of the cause of action, and for each putative class member no less. The Rules Enabling Act forbids interpreting the Federal Rules of Civil Procedure, including Rule 23, to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Accordingly, this court will not certify a class action under the premise that Ford will not be entitled to fully litigate that statutory element in front of a jury, at least for those class members where the facts and inferences to be drawn therefrom are disputed. *See Wal-Mart*

*v. Dukes*, 131 S.Ct. at 2561 ("Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims").

Corder also suggests that this court could use questionnaires, claim forms, or "judicial notice" to resolve the primary use inquiry. But none of those suggestions allow for Ford to do what Ford is entitled to do: litigate the issue before a jury with respect to each customer for whom the relevant facts and inferences to be drawn therefrom are disputed. Corder also suggests that an "appropriate trial plan" would allow for resolution of the necessary individualized inquiries. However, Corder does not provide any suggestion as to what sort of appropriate trial plan would allow for the resolution of the potentially numerous individualized inquiries without overwhelming the trial and the jury. Simply put, Corder cannot meet his burden of showing that class certification is appropriate by making conclusory statements that this court can use questionnaires, judicial notice, or an appropriate trial plan.

## IV.

In sum, before Ford may be deemed liable to any prospective class member under the KCPA, it must be established that the person's primary reason for purchasing a truck was for personal, family, or household use. That requires an individualized inquiry. And having to engage in numerous of those inquiries would quickly subsume any trial in this matter. As this court can see no way to efficiently manage such a trial, it finds that Corder has not met his burden of showing that class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3). His second motion for class certification will therefore be denied.

A separate order will issue in accordance with this opinion.

July 24, 2012

Charles R. Simpson III, Judge
United States District Court

D03